# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

### Nos. 21-3021, 3022

---

**UNITED STATES OF AMERICA,**                              **Appellee,**

**v.**

**ETHAN NORDEAN,**
**JOSEPH R. BIGGS,**                              **Defendant-Appellants.**

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

---

### APPELLANTS' MEMORANDUM OF LAW AND FACT

---

David B. Smith, DC Bar No. 403068      J. Daniel Hull, DC Bar No. 323006
Nicholas D. Smith, DC Bar No. 1029802  Hull McGuire PC
David B. Smith PLLC                    1420 N Street, N.W.
108 N. Alfred Street                   Washington, D.C. 20005
Alexandria, VA 22314                   (619) 895-8336
(917) 902-3869                         Counsel for Appellant Biggs
Counsel for Appellant Nordean

District Court
Cr No. 21-175 (TJK)


Request for Oral Argument

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

STATEMENT OF FACTS ................................................................ 5

    I.    Appellant Nordean ................................................................ 5

        A.    The government's first attempt to detain Nordean pretrial ............... 5

        B.    The government's second attempt to detain Nordean pretrial ............ 9

            1.    The government makes inaccurate claims about Nordean's use of "encrypted communications" on January 6 ................... 9

            2.    The government makes inaccurate claims about a "fake passport" ................................................. 11

            3.    The Chief Judge finds the § 1361 charge "weak" and releases Nordean ..................................................... 12

    II.    Appellant Biggs .............................................................. 14

    III.    The government moves to revoke Appellants' release orders ............... 15

        A.    The superseding indictment ........................................... 15

        B.    The first detention hearing on April 6 ................................ 19

        C.    The second detention hearing on April 19 ............................ 23

ARGUMENT ........................................................................... 28

    I.    The detention order did not comply with Federal Rule of Appellate Procedure 9 .................................................................. 28

    II.    The district court improperly assumed the accused bore the burden of persuading the court that clear and convincing evidence of unmitigable risk did not exist .................................................................. 31

    III.    The district court mistakenly determined that release conditions must guarantee, not merely reasonably assure, public safety .................. 33

    IV.    The district court's dangerousness finding is contrary to *Munchel* ....... 35

CONCLUSION ......................................................................... 41

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Ethan Nordean and Joseph Biggs have been charged in connection with the January 6 events at the Capitol.  They are not accused of assaulting or harming anyone that day.  They did not threaten or bully anyone.  They carried no weapons.  They did not steal.  Although they have been charged with depredating federal property ("shaking a fence"), the government has neither proffered nor alleged evidence showing property damage exceeding $1,000, the felony threshold amount, attributable to them.  Appellants have no criminal history.

For those reasons, three judges released Appellants pretrial, on strict conditions, on three occasions.  One was the Chief Judge for the District of Columbia.  Reviewing the original indictment returned against Nordean, the Chief Judge called the evidence supporting the charge upon which the government's detention motion rested "weak to say the least." The Chief Judge was also concerned that the government had made a series of grave factual claims about Nordean's activities on January 6, only to then withdraw them after he presented evidence showing their inaccuracy.  And, in the case of Appellant Biggs, the government did not even seek his detention at his initial appearance in Florida.

What happened next is uncontested.  Appellants complied with the strict conditions of their release, including home detention and GPS location monitoring, for two months in Biggs' case and over a month in Nordean's.

1

Yet, after Appellants' case was assigned a new district court judge, the government moved to revoke their release orders—for a third time in the case of Nordean. Although the predicate crime offered to trigger a detention hearing was the same charge the Chief Judge had found "weak to say the least," the government contended that a conspiracy charge newly filed in a superseding indictment changed the detention analysis.

The district court disagreed—at least initially.

The conspiracy charge rests on chat messages between members of the Proud Boys group on January 6. Yet the chats do not show Appellants agreeing to anything, much less to federal crimes. And while some members in the chats referred to a "plan" for that day, the district court made this finding in Appellants' initial bail revocation hearing:

> [L]ook, I also understand the argument that, Judge, look at the context and, from what happened, you can infer that this was a plan to do violence. Okay. Maybe that gets you somewhere, but I think there were probably a lot of people showing up that day with a lot of . . . different plans. Some went one way; some went the other way. In terms of connecting the planning to violence . . . these messages . . . don't move the needle that much.

Hr'g Trans., 4/6/21, p. 23:1-10.

The court's view did not lack prominent support. The former acting U.S. Attorney who himself led the January 6 investigation had recently conceded on the "60 Minutes" news show that, although he had given "marching orders" to prosecutors to "build" conspiracy charges, his office did not know whether the

2

Proud Boys had any "premeditated plan" to do the very thing the superseding indictment had already charged. Moreover, the district court added, this Court's decision in *United States v. Munchel*, __ F.3d __, 2021 U.S. App. LEXIS 8810 (D.C. Cir. Mar. 26, 2021), requires a "forward-[looking] [detention] analysis" assessing the risk of the accused's dangerousness after, not on, January 6. Hr'g Trans., 4/6/21, p. 23:18. Appellants also submitted evidence showing them stopping a protestor when he shoved a police officer outside the Capitol, showing Appellants foreswearing new political rallies, and showing a "plan" on January 6 inconsistent with an attempt to control Congress. At bottom, the court found, Appellants "have been out [of detention] now for the many weeks [and] it's been without a problem." *Id.*, p. 21:3-4.

But the court did not rule that day. In a second detention hearing—held nearly two weeks later—the court found that the same January 6 chats that "don't move the needle that much" now constituted something else: "clear and convincing evidence" of an unmitigable risk of danger to the community under 18 U.S.C. § 3142(g). The court did not explain the about-face. Acknowledging Appellants had complied with their strict conditions of release for weeks, the court simultaneously found that no "condition or combination of conditions" could mitigate the danger to the community. As to what, exactly, constituted the "identified and articulable threat to an individual or the community," *Munchel*, 2021 U.S. App. LEXIS 8810

at *19, the court found: "I simply don't know what I don't know." Hr'g Trans., 4/19/21, p. 57:22-23.  Asked whether it would accept a cash bond for all the money one Appellant raised to support himself under indictment, the Appellant's home as collateral against a breached condition, further restrictions on Appellant's liberty, and the removal of all electronic devices from the home, the court rejected them. It did not provide any reason as to why they could not "reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). Surrendering after the court revoked his release, Nordean was informed he would remain in his cell 24 hours a day for the next 21 days, without computer access to confer with counsel in writing.

The district court's detention decisions should be vacated for several reasons.  First, the court failed to "state . . . the reasons" why no condition or combination of conditions could mitigate Appellants' alleged dangerousness.  Fed. R. App. P. 9(a)(1).  In this Circuit, that requires a remand on its own.  Second, the court failed to apply the correct burden of persuasion.  Because the government, and not the accused, must show by clear and convincing evidence the "unmitigable threat to public safety," *Munchel*, 2021 U.S. App. LEXIS 8810, at *27, the court's conclusion that "I don't know what I don't know" should have redounded against the party whose burden it was, not the accused.  Third, the decision rested on the erroneous premise that the court must find that conditions guarantee no possibility

of danger when the standard is merely whether such conditions "reasonably" assure the community's safety.  Fourth, setting aside the incorrect legal standards, the decision was, substantively, clearly erroneous.  If the allegation that a January 6 defendant who had previously stockpiled firearms and who prowled the Capitol carrying a taser and zip-ties while vowing to "fuck shit up" does not constitute clear and convincing evidence of an unmitigable threat to public safety, there is no cogent rationale for finding such a threat here—after months of Appellants' compliance with strict conditions and release orders entered by three federal judges: factors absent in *Munchel*.

The decision below is irreconcilable with *Munchel* and other release orders involving January 6 defendants accused of more serious conspiracy charges, assaults on law enforcement, and serious property damage.  It should be reversed, or at least vacated for remand, to ensure uniform detention decisions and to prevent the misuse of the Bail Reform Act to punish or coerce the presumptively innocent.

## STATEMENT OF FACTS

**I.     Appellant Nordean**

### A.     The government's first attempt to detain Nordean pretrial

On February 3, Nordean was arrested in his home state of Washington on a criminal complaint charging him with one or two felonies (aiding and abetting

property depredation[1] and obstruction of an official proceeding) and two

misdemeanors (entry into a restricted area and uttering abusive language near the

Capitol) in connection with the events at the Capitol Building on January 6. That

morning, his wife was awoken by flash-bangs thrown into Nordean's home by a

large SWAT team. They pointed assault rifles at her. Handcuffed, she was

detained for approximately five hours and questioned without being Mirandized.

Nordean, 30, has no criminal history. Though he was not home when the search

commenced, he returned to surrender to the agents.

The criminal complaint alleged that, on January 6, a crowd gathered near the

pedestrian entrance to the Capitol grounds on First Street, SE, secured by police

standing behind a metal barrier. Compl., p. 7. "[T]wo men advanced toward [the]

metal gate. The crowd followed, and within minutes, the crowd overwhelmed the

U.S. Capitol Police officers [there.]" *Id.* Nordean "was not one of the two men

who initially advanced toward officers, but was present in the crowd[.]" Compl., p.

7. The complaint alleged that thousands of people then gathered in front of the

Capitol on its west side. "Among the first to reach the police line in the west plaza

of the Capitol was [Nordean.]" *Id.*, p. 8. Nordean "then appeared to engage in a

brief exchange with . . . Robert Gieswein. . ." *Id.* In turn, Gieswein "was among

---

[1] The property depredation offense is a felony only if the "damage" exceeds
$1,000. 18 U.S.C. § 1361. The complaint did not plead whether that threshold
amount was breached by Nordean.

the first to enter the Capitol through a window that was broken. . ." *Id.* But it is not Gieswein, the man with whom Nordean "appeared to engage in a brief exchange," who was alleged to have broken the window.

That was accomplished by another individual named Dominic Pezzola.[2] Compl., p. 8. In a footnote, the complaint added that it,

> Does not herein assert or intend to otherwise suggest that NORDEAN was present in the immediate vicinity when the [window-breaking] took place.

Compl., p. 9 n. 3.

Besides the broken window, the complaint did not cite any specific property damage attributable to Nordean. The complaint did not plead the content of the "brief exchange" or whether Nordean had any relationship with Gieswein. That was the basis for the complaint's charge that Nordean aided and abetted the depredation of property, pursuant to 18 U.S.C. § 1361. The complaint did not plead whether damage to the window exceeded $1,000, which is necessary to make the offense a felony "for which a maximum term of imprisonment of 10 years or more is prescribed," a statutory requirement for the rebuttable presumption of pretrial detention under 18 U.S.C. § 3142(e)(3)(C).

---

[2] The government's third motion to detain Nordean pretrial would represent as fact that Pezzola was "a Proud Boys member." Gov't Mot., p. 6. It cited no evidence supporting that contention. That claim is not accurate and, anyway, does not mean that Appellants are criminally liable for his actions absent agreement between Appellants and Pezzola to perform those actions.

7

The government moved the U.S. District Court for the Western District of Washington for Nordean's pretrial detention. *U.S. v. Ethan Nordean*, 21-mj-67, ECF No. 7 (W.D. Wash., Feb. 5, 2021). Its argument for detention was that because § 1361 is "an offense listed in section 2332b(g)(5)(B) of title 18," 18 U.S.C. § 3142(e)(3)(C), there was a rebuttable presumption of pretrial detention under that section. *Nordean*, 21-mj-67, ECF No. 7, p. 15. The Chief Magistrate Judge rejected the government's detention motion and ordered Nordean released on standard conditions. *Nordean*, 21-mj-67, ECF No. 9.[3]

The government then moved the District Court for the District of Columbia for an emergency stay of the Chief Magistrate Judge's order. *Nordean*, 21-mj-67, ECF No. 13. The Chief Judge entered a stay and ordered Nordean transferred to this district. *Id.*

However, Nordean was not transferred. He remained incarcerated in Seattle, Washington for 30 days. During that period of time, no indictment was returned with charges against Nordean and no probable cause hearing was held pursuant to Federal Rule of Criminal Procedure 5.1. This meant that Nordean's release from

---

[3] Pursuant to the Due Process Protections Act (DPPA), the court also ordered the government to produce materials under *Brady v. Maryland*, 373 U.S. 83 (1963) in a timely manner. *Nordean*, 21-mj-67, ECF No. 10. As shown *infra*, the government possessed *Brady* material at this time and did not produce it to Nordean so that it could be used in a timely manner.

8

custody was statutorily required.  18 U.S.C. § 3060(d).  The improper detention

was not harmless because the complaint upon which he was arrested did not plead

probable cause of a depredation offense pursuant to § 1361: the Chief Judge would

later find that the evidence adduced to prove that offense was "weak to say the

least."

### B.    The government's second attempt to detain Nordean based on inaccurate claims about "encrypted communications" and a "fake passport"

On February 23, Nordean moved to lift the stay on the Chief Magistrate

Judge's release order.  ECF No. 13.  In response, the government again predicated

its detention argument on its depredation of property charge pursuant to § 1361,

which the government said satisfied the rebuttable presumption of detention under

§ 3142(e)(3)(C).  ECF No. 17, pp. 2-3.

> 1.    *The government makes demonstrably inaccurate claims about Nordean's use of "encrypted communications" on January 6*

In addition to its § 3142(e)(3)(C) argument, the government made the

following factual claim to the Chief Judge in seeking to detain Nordean pretrial:

> Defendant—dressed all in black, wearing a tactical vest—*led the Proud Boys through the use of encrypted communications* and military-style equipment, and *he led them with the specific plans to: split up into groups, attempt to break into the Capitol building from as many different points as possible*, and prevent the Joint Session of Congress from Certifying the Electoral College results.

ECF No. 17, pp. 10-11 (emphasis added).

9

This factual claim, alleging conspiracy in all but name, was shown to be false. Nordean advised the Chief Judge that he could not have "led the Proud Boys through the use of encrypted communications" on January 6 because, among other reasons, his mobile phone was without power throughout the events of the day. ECF No. 19, p. 9. Although the government was at the time in possession of Nordean's phone, it did not disclose to the defense that exculpatory evidence existed showing that Nordean did not use "encrypted communications" on January 6. Questioned by the court on this point, the government acknowledged it possessed evidence showing Nordean's phone was without power during the relevant events on January 6. 3/3/21 Hr'g Trans., p. 38.[4]

The government separately contended that Nordean used a Baofeng radio—seized from his home on February 3—to lead a group of people into the Capitol on January 6. ECF No. 17, p. 15. However, Nordean then supplied the Court with an Amazon receipt showing that he did not receive the ham radio until January 7. ECF No. 19, p.11. When the Court asked about these factual reversals, the government advised the Court to simply disregard its grave claim that Nordean himself used "encrypted communications" on January 6 to lead an invasion of the Capitol Building. 3/3/21 Hr'g Trans., pp. 38-39.

---

[4] This evidence had not been produced to Nordean, contrary to the DPPA order entered in his case on February 8.

10

2.     *The government makes demonstrably inaccurate claims about a "fake passport"*

As a separate basis for detention, the government claimed that Nordean possessed a "fake passport" and thus posed a risk of flight.  It made this representation in two courts—in the Western District of Washington, *Nordean*, 21-mj-67, ECF No. 7, p. 19, and in the district court below, before the Chief Judge.  ECF No. 17, p. 21.  The claim was false; the government's evidence misleading.

To the Chief Judge, the government represented that "law enforcement agents discovered a valid U.S. Passport issued to someone else who looks like the defendant." ECF No. 17, p. 21.  The government did not include images in its brief.  Nordean filed images showing the individual in the passport bore no resemblance to Appellant.  The government also represented to the Court that "law enforcement found the passport on a clothes dresser on Defendant's side of the bed in the master bedroom, along with a passport issued to Defendant's wife." ECF No. 17, p. 21.  That was not the case.  As Mrs. Nordean explained in a sworn declaration submitted to the Court, the passport belonged to a man with whom she once had a relationship, some of whose personal effects, including this passport, were still in her possession after the relationship ended.  ECF No. 20.  The sworn declaration also stated that, contrary to the government's representations to two courts, law enforcement did not find "the passport on a clothes dresser on Defendant's side of the bed." Instead, they found it inside Mrs. Nordean's jewelry

11

box.  ECF No. 20.  It further stated that Mrs. Nordean had never seen Appellant

Nordean open or otherwise use the jewelry box and that Mr. Nordean had never

discussed using the passport with Mrs. Nordean.  *Id.*

All references to this claim would later be omitted in the government's third

motion to detain Nordean.

      3.    *The Chief Judge finds the § 1361 charge "weak" and releases Nordean*

In a March 3 hearing, the Chief Judge addressed the § 1361 charge that

Nordean aided and abetted the depredation of federal property on January 6.  The

Court and government had the following colloquy:

THE COURT: Well is it - - is it the Government's theory that under aiding and abetting liability that this defendant is responsible for all the damage done at the Capitol or just the damage done by Proud Boys members, or what?

AUSA: Your Honor –

THE COURT: He personally didn't – you don't have evidence that he personally engaged in any property damage.

AUSA: That is correct, Your Honor.  The Government – the Government is – for purposes of this hearing, the Government is asserting that Ethan Nordean is responsible for the property damage that was caused by those men who he led to the 1st Street gate and onto the Capitol grounds on January 6th.  This was an intended act in Ethan Nordean's statements in advance of the January 6th activities.   Ethan Nordean was clear that people thought – that people may have thought that this was simply going to be individuals making Facebook posts; but, no, we are going to bring back the spirit of 1776.  Your Honor, that is not simply a – kind of an affection for three-cornered hats and salt water taffy.  .  .

3/3/21 Hr'g Trans., pp. 42:13-43:9.

12

Turning to the pretrial detention factors under 18 U.S.C. § 3142(g), and in particular the weight of the evidence on the § 1361 charge, the Chief Judge entered the following factual finding into the record of this case:

THE COURT: **What the Government said in its original papers is that he directed the Proud Boys with specific plans, telling them to split up into groups and to attempt to break into the Capitol building**; **that's a far cry from what I heard at the hearing today.  And the Government has backtracked on saying that they actually did see – directly told them to split into different groups and had this kind of strategic plan**.

In addition, what I've heard at the hearing today is that the defendant, with this group, positioned himself at one of the entrances – pedestrian entrances to the Capitol and, you know, strutted right in front of the police barriers.  That's also a far cry from threatening or assaulting the police officers who were barricading the entrance to the Capitol.

He then – what I've heard at the hearing today is that the defendant's followers and other people in the crowd – not necessarily even Proud Boys – broke through the barriers, breached the police line and got into the Capitol, and the defendant went along with this mob.

**There is no allegation that the defendant caused injury to any person or that he even personally caused damage to any particular property. . . He was a leader of a march down to the Capitol.  Once they got there it's not clear what leadership role this defendant took at all to the people inside the Capitol or – even the evidence about the defendant directing people to break windows to get into the Capitol is weak, to say the least. . .**

[T]he weight of the evidence against the defendant for aiding and abetting the injury and depredation of Government property, under 18 U.S.C. section 1361, in an amount exceeding $1,000 when he personally didn't do anything – and **there is no evidence of *specific directions* by this defendant to tell his fellow Proud Boys carve some vulgar thing on a door or to – any other specific information about him giving those kinds of *precise orders*** is not as strong and overwhelming to say that the weight of the evidence favors pretrial detention . . .

3/3/21 Hr'g Trans., pp. 79-80 (emboldening and italics added).

The Court then ordered Nordean released on an appearance bond with strict conditions, including:

- Travel restricted to the Western District of Washington;

- Not possessing a firearm;

- Home detention for everything except employment, education, religious services, medical visits, or court appearances; and

- GPS location monitoring, for which Nordean must pay the costs.

ECF No. 23.

## II.    Appellant Biggs

A 37-year-old from North Carolina, Appellant Biggs is a retired U.S. Army Staff Sergeant who served honorably in the military for eight years. Between 2005-2009, he deployed both to Iraq and Afghanistan, each for about one year, earning several awards for his service, including two Purple Hearts. In 2018, Biggs relocated to Florida to care for his mother, a cancer patient. Before and after he turned himself in to the Middle District of Florida on January 20, he resided there with his three-year-old daughter. Also in 2018, Biggs became active as an organizer and event planner for the Proud Boys.

At his January 20 initial hearing in Florida, the government did not seek pretrial detention of Biggs. The criminal complaint had alleged that he had violated 18 U.S.C. § 1752 (entering a restricted area), § 1512(c)(2) (obstruction of

14

official proceeding) and 40 U.S.C. § 5104(e)(2)(D) and (G) (disorderly conduct and parading or demonstrating) by entering the Capitol Building on January 6. A magistrate judge in the Middle District of Florida released Biggs on strict conditions, including home detention and GPS location monitoring. He daily reported to his Pretrial Services Officer in Florida. On March 22, the Officer wrote that he had "no concerns" about Biggs' compliance with his conditions of release. ECF No. 47-1. On March 29, the Officer reported to the district court that Biggs had been "super compliant" with release conditions. ECF No. 40.

## III.    The government moves to revoke Appellants' release orders

### A.    The superseding indictment

On March 10, well after Nordean and Biggs had been released, the government filed a superseding indictment. ECF No. 26.   There were two material changes to the government's claims.  First, rather than alleging that Nordean depredated federal property under § 1361 by virtue of a "brief exchange" with a man who later climbed through a window of Congress, the superseding indictment now alleged as follows:

> While standing next to one another, NORDEAN and BIGGS *shook a metal barricade*, with Capitol police on the other side of the barricade, until NORDEAN and BIGGS and others in the crowd were able to knock it down. The crowd, including NORDEAN, BIGGS, REHL, and DONOHOE, advanced past the trampled barricade.

First Superseding Indictment (FSI), ¶ 58 (emphasis added).

15

Second, the superseding indictment charges that Appellants and two co-defendants violated 18 U.S.C. § 371 by agreeing,

> (1) to corruptly obstruct, influence, and impede an official proceeding, that is, Congress's certification of the Electoral College vote, and to attempt to do so, in violation of Title 18, United States Code, Section 1512(c)(2), and (2) to obstruct, impede and interfere with law enforcement officers engaged in the lawful performance of official duties incident to and during the commission of a civil disorder, in violation of Title 18, United States Code, Section 231(a)(3).

FSI, ¶ 26.

Because the overt acts of the conspiracy begin on November 5, 2020, *id.*, ¶ 31,[5] the government is alleging that the "conspiratorial agreement" was reached no later than two days following the 2020 presidential election, i.e., long before the conception of any plan to hold a political rally near the Capitol on January 6. The evidence of "conspiracy" mostly consists of the co-defendants making crude public remarks on social media about people who believe the 2020 presidential election was fairly decided. *Id.*, ¶¶ 31-38. At one point, Nordean posts on social media, "The spirit of 1776 has resurfaced." *Id.* ¶ 34.[6] The superseding indictment does not plead evidence of an agreement to commit any specific crime.

---

[5] The first "overt act" of a conspiracy concerning events transpiring on January 6, 2021 is Biggs posting on social media, in November 2020, that "it's time for fucking War if they steal this shit." FSI, ¶ 31.

[6] Judging by frequency of reference, the government represents that it believes this quote, more than any other, somehow warrants detaining a presumptively innocent person in pretrial confinement for a period of time that could last one year or more.

16

The superseding indictment cites messages exchanged among a group of 60 or more Proud Boys in the Telegram chat app on January 5 and 6, some of whom referred to a "plan." FSI, ¶ 43.  There is no specific allegation in the charging instrument indicating whether the "plan" was criminal in nature, or merely a plan to meet and rally on January 6, like hundreds or thousands of other people that day.[7]

The alleged "manner and means" of the conspiracy consists of these things:

- Raising funds "to support travel and equipment purchases for the visit to Washington, D.C., on January 6";

- "Obtaining paramilitary gear and supplies—including tactical vests, protective equipment and radio[s] . . .";

- "dressing 'incognito' rather than wearing Proud Boys colors that had been prominently displayed at previous events";

- "Using programmable handheld radios, encrypted message applications, and other communications equipment to communicate and coordinate the January 6 attack";

---

[7] On March 25, the government produced to Appellants 1,500 pages of Telegram chats from which the government selectively drew the messages on which its conspiracy charge is based.  ECF No. 41.  These encompassed the Proud Boys' communications in Washington, D.C., between January 5 and 6.  *Id.*  The chats do not contain a single, specific reference to any crime.  The chats contain many messages from group members indicating there was no plan or coherent organization at all on January 6.  *Id.*  To take one example, one member posted an article reporting that the president had just ordered the deployment of the National Guard.  Commenting on the article, the member said, "Umm I don't think the plan was to attack[], damage, and attempt to control government building." ECF No. 41, p. 6.

- "Dismantling" and "storming past" barricades.

FSI, ¶ 28.

For each of these "manner and means" the public record is thick with lawful explanations inconsistent with a January 6 conspiracy.  Raising funds to travel to a political event is neither unlawful nor uncommon.  ECF No. 53, p. 3.  Many publicly available reports show members of the Proud Boys wearing "protective equipment" for years prior to January 6 and at events that did not lead to illegal activity.  ECF No. 19, p. 10.  They did so partly because at least four members of their group had been stabbed.  *Id.*  Similarly, the group chose not to wear its "colors" on January 6 as members had been previously recognized by those colors and attacked on several occasions.  ECF No. 53, p. 2.  Proud Boys events held in Washington, D.C., prior to January 6 similarly involved walking toward the Capitol Building—but did not entail illegal activity.  *Id*.  As for the "dismantling" of barricades on January 6, the government has never alleged or proffered any evidence showing Appellants taking that action.

On March 22, after the superseding indictment was returned, CBS News published an interview that the former acting U.S. Attorney who led the January 6 investigation conducted for a nationally televised audience on the "60 Minutes" program.  The former U.S. Attorney had previously stated publicly that he had given "marching orders" to his office to "build" January 6 conspiracy cases.  *DOJ*

18

*probing sedition in connection with Capitol riot*, Politico, Jan. 12, 2021, available at: rb.gy/wuqnvt.  Yet, on "60 Minutes," the former U.S. Attorney indicated his office did not know whether the Proud Boys had a "premeditated plan" to enter the Capitol building.  *Inside the prosecution of the Capitol rioters*, CBS News, Mar. 22, 2021, available at: rb.gy/c7xosq.

### B.    The April 6 detention hearing

After filing the superseding indictment, the government moved to revoke Appellants' release orders.  ECF Nos. 30, 31.  The putative basis was not that Appellants had failed to comply with the strict conditions of their release, but that the Telegram chats, which the government had possessed for weeks, changed the detention analysis performed by three prior federal judges.  *Id.*

Although the government's revocation argument centered on the new conspiracy charge, the government did not use that charge to satisfy the Bail Reform Act's threshold requirement either that (i) the detainable offense be one of those listed 18 U.S.C. § 3142(f)(1) or that (ii) the defendant presents a risk of flight or obstruction of justice.  § 3142(f)(2).  A charge of conspiracy under 18 U.S.C. § 371 is not a detainable offense under § 3142(f)(1) and the government had dropped its risk-of-flight argument and did not make an obstruction-of-justice detention argument.  ECF Nos. 30, 31.  Instead, the government contended that the court may detain Appellants because its depredation of property charge under § 1361

was a "crime of violence" under § 3142(f)(1)(A), and that a rebuttable presumption of detention applied because § 1361 is "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code. . ." ECF Nos. 30, 31 (citing 18 U.S.C. § 3142(e)(3)(C)).  However, both of those subsections require that the crime be one "for which a maximum term of imprisonment of 10 year or more is prescribed." §§ 3142(f)(1)(A), 3142(e)(3)(C).  As shown above, the superseding indictment neither alleges facts showing Appellants' depredation of federal property nor damage exceeding $1,000, which is the threshold for a felony offense punishable by up to 10 years. § 1361.[8]

Addressing the conspiracy charge in general and, in particular, the appearance of the word "plan" scattered among 1,500 pages of Telegram chats between a group of at least 60 people, the district court found:

> [L]ook, I also understand the argument that, Judge, look at the context and, from what happened, you can infer that this was a plan to do violence. Okay. Maybe that gets you somewhere, but I think there were probably a lot of people showing up that day with a lot of . . . different plans.  Some went one way; some went the other way.  In terms of connecting the planning to violence . . . these messages . . . don't move the needle that much.

Hr'g Trans., 4/6/21, p. 23:1-10.

---

[8] The superseding indictment alleges Appellants "shook a metal barricade," FSI, ¶ 58, which is not the same as destroying it or an allegation that any damage exceeded $1,000.  The charging paragraph alleges Appellants depredated federal property "caus[ing] damage to the [Capitol] building in an amount more than $1,000." *Id.*, ¶ 74.  But the superseding indictment alleges no facts showing Appellants caused damage to that building.

20

The court also observed that although the government had represented that video footage captured Appellants "personally dismantling a metal barricade" outside the Capitol building, the video had not been submitted to the court. Hr'g Trans., 4/6/21, p. 25:22-25. Appellants suggested that the video had not been submitted because it did not support the representation that they "personally dismantled a barricade." *Id.*, p. 33:22. The court requested the video from the government.

Appellants brought to the Court's attention that they had submitted evidence inconsistent with the conspiracy charge. The superseding indictment alleges that Appellants nurtured a months-long plan to assume control of Congress and stop the Electoral College vote on January 6. It alleges Appellants entered the Capitol building around 2 p.m. that day.    FSI, ¶ 20. Yet Nordean submitted sworn declarations stating that Appellants' actual "plan" for the afternoon of January 6 was inconsistent with that alleged in the indictment.    Hr'g Trans., 4/6/21, p. 45. Two witnesses swore that Nordean had asked a musician to perform for the Proud Boys members at a residence they had rented in Washington, D.C., through Airbnb. ECF Nos. 41-1 (declaration of Michale Graves), 41-2 (declaration of Arturo Santaella). The plan was for the musician to perform at around 3-4 p.m. on January 6. *Id.* A deeply laid plan to assume control of the seat of government would appear to be inconsistent with planning a music party to occur about an hour

afterward blocks away from the scene of the historic crime.  Yet the government did not contest the veracity of these declarations.[9]

Finally, even though Appellants had complied with the strict conditions of their release, Nordean proffered that if the Court had any concerns on that score, it could simply impose a special condition to prevent Appellants from communicating with other Proud Boys, which would not be an uncommon condition in these types of cases.  Hr'g Trans., 4/6/21, p. 61:25.  The court responded that that was "something [it] was going to raise." *Id.*, p. 62:6.  But it ended the hearing shortly thereafter without a ruling.  *Id.*

---

[9] Nordean also showed that the offense on which the conspiracy charge rests is not a well-pleaded crime.  ECF No. 32, pp. 17-18.  The superseding indictment charges that Appellants conspired to violate § 1512(c)(2), obstruction of an official proceeding, by virtue of interrupting the Electoral College vote count by the joint session of Congress.  FSI, ¶ 26.  Yet it is Section 1505 of title 18 that criminalizes obstruction of proceedings in Congress "by threats or force." 18 U.S.C. § 1505. The government did not charge that offense here because that section only covers "inquir[ies] or investigation[s] . . . being had by either House, § 1505, and the ceremonial counting of Electoral College votes was neither, according to the indictment itself.  FSI, ¶¶ 3,4 (members of Congress "formalize" result, not hear evidence).  By contrast, the legislative history of § 1512(c)(2) shows that statute was designed to clarify loopholes in the existing laws related to the destruction or fabrication of evidence and the preservation of financial and audit records.  ECF No. 32, p. 18.  The government did not contest this argument, which was therefore forfeited.  ECF No. 49-1, p. 3.  *See Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016).

**C.     The April 19 detention hearing**

After the April 6 hearing, the court did not decide the governments'
revocation motions until April 19.  Between those dates, the government presented
no new evidence, but Appellants submitted a video depicting them stopping a
protestor on January 6 after he shoved a police officer, ECF No. 57,[10] and an audio
recording of Nordean, made two days before his arrest, in which he urged Proud
Boys to discontinue any rallying in the future.  ECF No. 54.

The Court granted the government's motions to revoke release.  Hr'g Trans.,
4/19/21, p. 3.  It acknowledged that, for over a month, Appellants had "complied
with their conditions of release." *Id.*, p. 57:21-22.  The court also found that:

> [I]t's [] fair to say that the allegations the government is relying on here are
> not the kind that courts in our district have typically relied on to detain most
> January 6 defendants before trial, at least so far, because they lacked some of
> the unusual markers – the more obvious markers of dangerousness.  For
> example . . . there's no allegation that Nordean or Biggs carried weapons
> themselves or that they themselves took it upon themselves to fight with
> police officers directly.

 Hr'g Trans., 4/19/21, p.15:18-25.

The court then read nearly all of the 18-page superseding indictment into the
record without comment.  Hr'g Trans., 4/19/21, pp. 17-40.  As for the depredation

---

[10] Although the government filed this video in another Capitol case, it had neither
notified Appellants nor produced it to them: another violation of the DPPA order in
this case.  ECF No. 52.

of property charge, the court stated it had watched the video which the government represented showed Appellants "personally dismantling a metal barricade." *Id.*, p. 34:4. The court found that it did not "find it terribly compelling in terms of showing that Nordean and Biggs themselves shook a barricade." *Id.*, p. 34:4-7.[11] Nevertheless, the court found that the depredation of property charge still satisfied §§ 3142(f)(1)(A) and 3142(e)(3)(C). However, it also found that Appellants satisfied their burden to produce evidence rebutting the presumption of detention under § 3142(e)(3)(C). Hr'g Trans., 4/19/21, p. 54:11.

Turning to the detention factors in 18 U.S.C. § 3142(g), the court then stated that it would follow factors the Chief Judge had used to determined whether to detain a Capitol case defendant in *United States v. Chrestman*, __ F. Supp. 3d __, 20201 U.S. Dist. LEXIS 36117 (D.D.C. Feb. 26, 2021). Hr'g Trans., 4/19/21, p. 40: 20. The court did not acknowledge that the Chief Judge had released Nordean after deciding *Chrestman*, after the parties had fully argued the *Chrestman* factors, and that the parties had contemplated a future conspiracy charge in that detention hearing. Hr'g Trans., 3/3/21, pp. 71-72.

Addressing the weight of the evidence under § 3142(g)(2), the court said the conspiracy evidence was "strong." Hr'g Trans., 4/19/21, p. 45:25. This was the

---

[11] The barricade-shaking video was the sole piece of evidence supporting the government's sole basis for detention under § 3142(f)(1)(A) and 3142(e)(3)(C).

same evidence the court, on April 6, said does not "move the needle that much."

Hr'g Trans., 4/6/21, p. 23:1-10.

As for "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," § 3142(g)(4), the court found:

> [T]hrough their leadership in the case of Nordean and their planning skills in the case of Biggs and the networks that these two individuals can draw on, these defendants can produce events that draw large numbers of people, including Proud Boys . . . and still others on the opposite side of the political spectrum like Antifa.  And they have now – they're at least alleged to have facilitated violence,[12] either against other civilians or law enforcement, at a large event. *Even if the election has passed, politics has not*.[13]   Along these lines, it also matters that the *defendants have never, at least on the record before me, expressed regret or remorse*.

Hr'g Trans., 4/19/21, p. 55:6-18 (emphasis added).[14]

As to whether any conditions could mitigate this dangerousness, the court found it did not "think even the most stringent suffices":

---

[12] The superseding indictment does not allege Appellants facilitated violence.

[13] Following the revocation order, the government produced post-1/6 statements from Nordean forswearing future political rallies.  Because they were not produced in time for the revocation hearings, this was yet another violation of the DPPA order.  ECF No. 79.

[14] In the written detention order, the court noted Biggs received calls from the FBI in 2018, ECF No. 66, p. 3, but failed to acknowledge these "cautionary" calls stopped.  ECF No. 42, pp. 5-6.  Moreover, there is no evidence Biggs "lied" to the FBI about January 6 or anything else.

These two individuals *could* . . . evade conditions like, for example, as the parties have suggested, requiring no contact with other Proud Boys or even being prohibited from using a computer by simply having an associate in their network come over to their house and lend them a smartphone. . . [T]here's really no way *to ensure* that doesn't happen. . .

[T]he allegations here involve taking steps to conceal communications from others, including law enforcement, including by using Telegram. . . And, not to be forgotten, the use of the radios on January 6th also *appears to be* a method of concealing communications being detected by law enforcement. . .[15]

Nordean's reporting of his passport being lost, and especially the timing of his reporting of a stolen firearm to authorities and then to his Pretrial Services officer much later, seem, together, highly suspect. . .[16]

And finally, although defendants have complied with their conditions of release, *I simply don't know what I don't know*. . .

Hr'g Trans., 4/19/21, p.57 (emphasis added).

Nordean then offered the following special conditions, individually or in combination, to the Court:

---

[15] The superseding indictment does not allege that Appellants used Telegram or radios to avoid law enforcement. As noted above, Nordean did not possess the ham radio referenced by the court until after January 6. Government agents seized it on February 3.

[16] Reporting a lost passport is so common that Probation Offices have model forms to file when it happens. Nordean filed it here. The U.S. Passport Office confirms Nordean's lost passport has expired and cannot be used. On April 6, Nordean explained to the court that he simply wanted to first get his facts right about the firearm so they could be accurately conveyed to the Probation Officer. Hr'g Trans. 4/6/21, p. 60. The Probation Officer advised Nordean "we are not alleging any sort of violation."

26

- Removal of all electronic devices from the home, including cell phones, all computers, laptops, everything except a landline telephone to communicate with counsel;

- Restricting all discretion of the Probation Office to allow Nordean to leave the home, except for medical emergency;

- Allowing the Probation Officer, with Nordean's consent, to conduct warrantless and unannounced searches of the home to examine whether the GPS location monitoring and strict home confinement are somehow not working;

- A cash bond of all funds Nordean has raised to support himself, his wife and his child while under indictment;

- Putting up his home as collateral against a breach of any release condition;

- Electronic surveillance outside the home.

Hr'g Trans., 4/19/21, pp. 62-64.

The court rejected these proffers. It stated: "[N]othing you have said *actually prevents* . . . an associate from visiting [Appellants] in their home and providing them with a smartphone for some period of time." It added that although pretrial services can "give spot checks," "that person is not standing outside Mr. Nordean's door." Hr'g Trans., 4/19/21, p. 65:22 (emphasis added).

Nordean asked, "Is Your Honor finding that a condition of the collateralized home and a bond would not suffice to ensure compliance?" *Id.*, p. 66:4. The court found:

Well, again, the problem with that is, *I have no way of knowing what I don't know*. In other words, Mr. Nordean or Mr. Biggs *could* engage in all sorts of

27

communications with other people . . . and there would not be any way for the Court to know that that had happened . . . [Home collateral and a bond] would create a risk for him but . . . *I would not know what I don't know* and he *could be* doing all sorts of things that there would be no way of ever finding out. . .

Hr'g Trans., 4/19/21, p. 66:8-18 (emphasis added).

Nordean asked the court if electronic surveillance options outside the home would reasonably mitigate. The court stated, "I've thought about a lot of options, but I'm not going to sit here and have you pepper me with, you know, things that you haven't presented before." *Id.*

Nordean surrendered to SeaTac FDC on April 20. He was advised he would be detained in his cell 24 hours a day for the next 21 days, without access to a computer to communicate in writing with legal counsel. On April 22, Biggs surrendered. His home detention had been over three months in length.

## **ARGUMENT**

### I.    The detention order did not comply with Federal Rule of Appellate Procedure 9

Federal Rule of Appellate Procedure 9 provides: "The district court must state in writing, or orally on the record, the reasons for an order regarding the release or detention of a defendant in a criminal case." Fed. R. App. P. 9(a)(1). As this Court has explained, "'the District Judge's reasoning must be delineated both out of fairness to the appellant and as an aid to this court in its role in bail administration.'" *United States v. Stanley*, 469 F.2d 576, 582 (D.C. Cir. 1972)

28

(quoting *Weaver v. United States*, 405 F.2d 353 (D.C. Cir. 1968)).  *See also United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996) (reversing detention decision because "there is no indication in the record" that the district court "fully explored" the appellant's proffered conditions).

In this Circuit, the Rule 9 requirement is more particular than simply stating any reason for detention with a citation to the Bail Reform Act.  Specifically:

> The District Judge should indicate not only which one or more of [the statutory] reasons prompted him to deny release but . . . [h]e should also *inquire concerning available financial and nonfinancial conditions of release* and *offer reasons why they do not assure* that the person will not flee or pose a danger to any other person or to the community.

*Stanley*, 469 F.2d at 584 (quoting *Weaver*, 405 F.2d at 353) (emphasis added).

Absent such a "*Weaver* statement," a detention order "is little more than . . . an expression of opinion that release conditions would not suitably safeguard against . . .dangerousness." 469 F.2d at 584.  "Vague insinuations" do not "comport[] with *Weaver* standards." *Id.*

The issue is not just a matter of Rule 9.  In *United States v. Salerno*, the Supreme Court held that the Bail Reform Act survived a challenge under the Excessive Bail Clause of the Eighth Amendment. 481 U.S. 739, 752 (1987). However, the Court observed that there remained the Excessive Bail Clause issue that "the government's proposed conditions of release or detention [must] not be 'excessive' in light of the perceived evil." *Id.*, at 754.  But to even address the

constitutional issue, *Salerno* observed, courts "*must compare* that response against the interest the government seeks to protect . . ." *Id.* (emphasis added).  The *Salerno* Court was effectively referring to *Weaver* statements.

Here, the court's finding that no condition or combination of conditions would reasonably mitigate Appellants' alleged dangerousness did not comport with *Weaver* and Rule 9. The court did not "inquire concerning available financial and nonfinancial conditions" that would mitigate Appellants' dangerousness.  *Weaver*, 405 F.2d at 353.  Instead, it terminated a discussion of the possible conditions. Hr'g Trans., 4/19/21, p. 66.  When Appellant Nordean offered a bond for all money he had raised to support himself under indictment and his home as collateral, the court rejected these conditions on the basis that "I would not know what I don't know." Hr'g Trans., 4/19/21, p. 66:8-18.  But that statement: (1) is true in every single detention determination; and (2) is a "vague insinuation" that does not "comport[] with *Weaver* standards." 469 F.2d at 584.  If a bond and collateral could not reasonably mitigate dangerousness every time a court did not know what it does not know, those conditions would never suffice in any amount. That would constitute "excessive bail." *Salerno*, 481 U.S. at 752.

Asked whether the court would consider electronic surveillance options, the court stated: "I'm not going to sit here and have you pepper me with, you know, things that you haven't presented before."  Hr'g Trans., 4/19/21, p. 66:8-18.

30

However, (1) Appellants had attempted to present such conditions in the previous detention hearing and the court indicated it would hear them later, Hr'g Trans., 4/6/21, p. 62:6, and (2) Appellant Nordean raised these conditions as an offer of proof for the court to consider. *Id.*, at 58:25. A refusal to consider a condition of release that would address speculative concerns about someone infiltrating Appellants' homes to give them phones did not comport with the *Weaver* statement rule. *Stanley*, 469 F.2d at 582; *Xulam*, 84 F.3d at 443.

## II. The district court improperly assumed the accused bore the burden of persuading the court that clear and convincing evidence of unmitigable risk did not exist

To detain a presumptively innocent person, the government carries the burden of persuading the court by clear and convincing evidence of "an unmitigable threat to public safety." *Munchel*, 2021 U.S. App. LEXIS 8810, at *19.

Here, the court mistakenly imposed the burden on Appellants to prove by clear and convincing evidence the *absence* of an unmitigable threat to public safety. The court found on several occasions that "I don't know what I don't know." Hr'g Trans., 4/19/21, pp. 57,66. By this, the court appears to have been alluding to the possibility that "an associate in [Appellants'] network . . . *could* . . . come over to their house and lend them a smartphone. . ." Hr'g Trans., 4/19/21,

p.57 (emphasis added). At the outset, it must be noted that the government did not proffer this to the court, which raised it *sua sponte* and without evidence.

It is in the very nature of a burden of persuasion that if the court is left *without knowledge* of whether a relevant fact has been established, the fault lies with the party carrying the burden—not the other party. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (explaining that the term "burden of persuasion" means that the party with the burden "loses if the evidence is closely balanced"); *Beeman v. United States*, 871 F.3d 1215, 1225 (11th Cir. 2017) ("Where, as here, the evidence does not clearly explain what happened[,] the party with the burden loses."); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378-79 (Fed. Cir. 2015) ("Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point—thus, if the fact trier of the issue is left uncertain, the party with the burden loses."); *Lovell ex rel. Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373 (9th Cir. 1996) ("In general, if the evidence is evenly balanced, such that a decision on the point cannot be made one way or the other, then the party with the burden of persuasion loses."); *Cuppett v. Duckworth*, 8 F.3d 1132, 1140 n.5 (7th Cir. 1993) (en banc) ("A party with the burden of persuasion loses if he fails to meet that burden."); 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5122 (2d ed. 2019) ("[A]ll the jury needs to be told is

that if it cannot decide who should win, the party with the burden of persuasion loses.").

Because the court "did not know what [it] did not know," the government's motions to revoke should have been denied.

## III.    The district court mistakenly determined that release conditions must guarantee, not merely reasonably assure, public safety

Assuming detention is authorized under § 3142(f), the court must determine whether any condition or combination of conditions will "*reasonably* assure the appearance of the person as required or . . . the safety of any other person or the community." 18 U.S.C. § 3142(c)(1) (emphasis added).  As this Court has held, "Section 3142 speaks of conditions that will 'reasonably' assure appearance, *not guarantee it*." *Xulam*, 84 F.3d at 444 (emphasis added); *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Requiring that release conditions *guarantee* the community's safety would fly in the teeth of Congress's clear intent that only a limited number of defendants be subjected to pretrial detention.") (emphasis original); *United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985) (en banc) (courts cannot demand more than an "objectively reasonable assurance of safety").

Consider this Court's decision in *Xulam*.  The district court detained the defendant as an unmitigable risk of flight.  84 F.3d at 444.  This was based on the court's finding that "if the defendant were to flee, his supervisors could not stop him." *Id.*  This Court reversed because "Section 3142 speaks of conditions that will

33

'reasonably' assure appearance, not guarantee it." *Id.* After all, the district court's logic, this Court said, "is true of every defendant released on conditions." *Id.*

Just so here. The district court found that, even if all electronics were removed from Appellants' homes, "an associate in [Appellants'] network . . . *could* . . . come over to their house and lend them a smartphone. . ." Hr'g Trans., 4/19/21, p.57 (emphasis added). The court's decision was in error because it is premised on the assumption that conditions of release must guarantee no danger to the community. But the standard is whether conditions exist that may "reasonably assure" safety. § 3142(c)(1). As this Court observed in *Xulam*, the speculative possibility that a person *could* lend the accused a smartphone, "is true of every defendant released on conditions." 84 F.3d at 444.

The court added that Appellants' use of the Telegram chat app and Biggs' use of a radio was evidence—per se—of their intent to evade law enforcement detection. Hr'g Trans., 4/19/21, p.57. But there was no evidence submitted that Appellants used these communications for the purpose of evading law enforcement.

The Telegram app has 500 million users. *Telegram Revenue and Usage Statistics*, The Business of Apps, Mar. 8, 2021, available at: https://bit.ly/2QqnR0g. Its main competitor, WhatsApp, boasts 2 billion. *WhatsApp Revenue and Usage Statistics*, The Business of Apps, Mar. 9, 2021,

available at: https://bit.ly/2PrwcAc.  If speculation about chat app usage were sufficient to defeat "reasonable assurance" of public safety, the Bail Reform Act's protections would be eliminated for swaths of the globe.[17]

## IV.   The district court's dangerousness finding is contrary to *Munchel*

In *Munchel*, defendants Munchel and Eisenhart participated in the January 6 events at the Capitol.  Both wore tactical vests, and Munchel had a taser.  *Munchel*, 2021 U.S. App. LEXIS 8810, at *3.  As they approached the Capitol, Eisenhart told Munchel they should go in, but added, "we're going straight to federal prison if we go in there with weapons." *Id.*  Accordingly, before they entered the building Munchel stashed a knife in a fanny pack and what might have been a firearm.  *Id.*, at *4.  Eisenhart encouraged others to enter the Capitol, repeatedly stating "let's go in." When a man claimed to have "punched two of them in the face," Eisenhart "encouraged him." *Id.*  For his part, Munchel announced, "we're not playing fucking nice no god damn more" and he was "fucking ready to fuck shit up." *Id.* Near the Capitol entrance Munchel stated that this is "probably the last time I'll be able to enter the building with armor and . . . fucking weapons." *Id.*

While inside the building, Munchel grabbed plastic handcuffs, known as "zip ties," explaining, "Zip ties! I need to get me some of them motherfuckers."

---

[17] Moreover, the government withheld from the court and Appellants several Telegram statements showing Appellants forswearing future political rallying, in violation of the DPPA order. *Supra*, p. 25 n. 16.

*Id.*, at \*5.  Entering the Senate gallery, Eisenhart chanted "Treason" while

Munchel stated, "I want that fucking gavel." *Id.*

The next day, as they packed their car, Eisenhart said the following to the

media:

> This country was founded on revolution. If they're going to take every
> legitimate means from us, and we can't even express ourselves on the
> internet, we won't even be able to speak freely, what is America for? . . . I'd
> rather die as a 57-year-old woman than live under oppression. I'd rather die
> and would rather fight.

*Id.*, at \*6.

For his part, Munchel was quoted in the newspaper as follows:

> We wanted to show that we're willing to rise up, band together and fight if
> necessary. Same as our forefathers, who established this country in 1776. . . .
> It was a kind of flexing of muscles. . . . The intentions of going in were not
> to fight the police. The point of getting inside the building is to show them
> that we can, and we will.

*Id.*, at \*6.

In a later search of their home, the FBI found tactical vests and a stockpile of

firearms.  *Id.*, at \*6. The district court detained Munchel and Eisenhart pretrial,

finding that the potential danger they posed to the community weighed in favor of

detention and that they were not likely to be deterred by release conditions.  *Id.*, at

\*11. "The crux of the district court's reasoning was that . . . the appellants used

force to subvert a democratic election and arrest the peaceful transfer of power.

Such conduct threatens the republic itself." *Id.*, at \*18.  The district court also

faulted defendants for not showing remorse, citing their comments that they would fight and die. *Id.*

This Court vacated the detention order. It observed that, under *Salerno*, the government must prove "'by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community.'" *Id.*, at *13 (quoting *Salerno*, 481 U.S. at 751). This Court found that the district court did not explain how it reached its conclusion notwithstanding "the absence of any record evidence that either Munchel or Eisenhart committed any violence on January 6." *Id.*, at *22. This Court also found dispositive that the defendants "assaulted no one"; "did not enter the Capitol by force"; and "vandalized no property." *Id.* Moreover, this Court found that the district court,

> failed to demonstrate that it considered the specific circumstances that made it possible, on January 6, for Munchel and Eisenhart to threaten the peaceful transfer of power. The appellants had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests. . . The District Court found that appellants were a danger to "act against Congress" in the future, but there was no explanation of how the appellants could be capable of doing do now that the specific circumstances of January 6 have passed.

*Id.*, at *23.

Judge Katsas concurred in part and dissented in part. *Id.*, at *26. The only reason he dissented was that he would not have remanded "for a do-over, [but] reverse[d] outright." *Id.* Judge Katsas added the following analysis. The initial

37

magistrate judge had determined that Munchel and Eisenhart could be released on strict conditions—the ones Appellants were released on here. Yet "[t]he district court gave no plausible explanation for why these stringent conditions would not reasonably ensure public safety." *Id.*, at \*36. Judge Katsas:

> [T]he transition has come and gone, and that threat has long passed. In the district court, the government warned of an upcoming protest scheduled for March 4. But that protest never materialized, and the government produced no evidence that Munchel and Eisenhart had been involved in its planning before their arrest. The government's gesturing towards the possibility of their joining future protests falls well short of any "identified and articulable threat."

*Id.*, at \*34.

There is virtually no part of the district court's decision here that is consistent with *Munchel*. As in *Munchel*:

- Appellants committed no acts of violence on January 6;

- Appellants did not enter the Capitol by force;

- There is no evidence Appellants destroyed federal property;

- The district court here also cited "revolutionary bravado" and stopping the "transfer of power" to detain Appellants;

- The district court cited Appellants' public comments about their willingness to "fight" to detain them, as in *Munchel*;

- The district court, as in *Munchel*, "gave no plausible explanation for why . . . stringent [release] conditions would not reasonably ensure public safety";

- The district court detained Appellants because they did not express remorse—like Munchel and Eisenhart.

38

Moreover, Appellants' case for release was stronger than that of the *Munchel* defendants because, unlike those defendants:

- Appellants were not carrying weapons into the Capitol;

- There was no evidence Appellants stashed weapons outside the Capitol building;

- There was no evidence Appellants stockpiled weapons;

- Appellants had complied with their conditions of release for over a month, in Nordean's case, and three months in Biggs';

- Appellants repeatedly foreswore political rallying after January 6.

The district court appeared to rely on one obiter dictum from *Munchel*. This Court said, "[T]hose who actually assaulted police officers and broke through windows, doors and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." 2021 U.S. App. LEXIS 8810, at *22; Hr'g Trans., 4/19/21, p.54:20. However, the superseding indictment does not allege that Appellants conspired to "assault[] police officers and b[reak] through windows, doors and barricades. . ." *Munchel*, 2021 U.S. App. LEXIS 8810, at *22. Nor has the government proffered such evidence. Instead, the superseding indictment cherry-picks messages from a 60-person chat group to create the impression of a "plan" that does not involve any

specific criminal activity. Video evidence shows Appellants *stopping* an assault on law enforcement on January 6.

Or, as the district court aptly put it (in the initial revocation hearing), the conspiracy charge does not "move the needle that much." Hr'g Trans., 4/6/21, p. 23:1-10.

The district court's decision also conflicts with many other detention decisions in the same district, where a Capitol defendant's conspiracy charge did not lead to automatic detention because of *Munchel*'s dicta:

- *U.S. v. Caldwell*, 21-cr-28, ECF No. 75 (D.D.C. 2021) (Mehta, J.) (leader of Oath Keepers conspiracy released on strict conditions, including a ban on communications with Oath Keepers members. Oath Keepers members equipped in paramilitary uniforms entered the Capitol in military "stack" formation and had trained in combat tactics before January 6);

- *U.S. v. Steele*, 21-cr-28 (D.D.C. 2021) (member of Oath Keepers conspiracy released on strict conditions);

- *U.S. v. Connie Meggs*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. Crowl*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. Young*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. James*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. Klein*, 21-cr-236, Apr. 12, 201 (D.D.C. 2021) (Bates, J.) (releasing defendant who placed himself at front of mob and used force against several officers to breach the Capitol's entrance);

- *U.S. v. Barnett*, 21-cr-38 (D.D.C. 2021) (Cooper, J.) (releasing man who entered Capitol with stun gun, stole mail from the House Speaker, and left threatening note on her desk);

- *U.S. v. Griffin*, 21-cr-92 (D.D.C. 2021) (Howell, C.J.) (releasing man who said that if there were a Second Amendment rally at the Capitol there would be "blood runnin'" from walls).

In sum, the decision below is clearly erroneous for the same—and more persuasive—reasons that this Court identified in *Munchel*.

<u>**CONCLUSION**</u>

For the foregoing reasons, Appellants respectfully request that the Court reverse the district court's orders revoking Appellants' previous release orders, or at least vacate the revocation orders and remand for reconsideration.

Dated: May 3, 2021                              Respectfully submitted.


<u>/s/ David B. Smith</u>                              <u>/s/ J. Daniel Hull</u>
David B. Smith (D.C. Bar No. 403068)    J. Daniel Hull (D.C. Bar. No. 323006)
108 N. Alfred St.                                     Hull McGuire PC
Alexandria, VA 22314                             1420 N Street, N.W.
Phone:(703)548-8911                              Washington, D.C. 20005
Fax:(703)548-8935                                  (619) 895-8336
dbs@davidbsmithpllc.com                        jdhull@hullmcguire.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869

## Certificate of Service

I hereby certify that on the 3rd day of May, 2021, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Nicholas Coleman
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530
> (202) 252-7846

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> /s/ David B. Smith
> David B. Smith, D.C. Bar No. 403068
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com
> *Counsel to Nordean*

> */s/ J. Daniel Hull*
> J. Daniel Hull (D.C. Bar. No. 323006)
> Hull McGuire PC
> 1420 N Street, N.W.
> Washington, D.C. 20005
> (619) 895-8336
> jdhull@hullmcguire.com
> *Counsel to Biggs*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [10,390] words.

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*].

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated:__*May 3, 2021*_____          */s/      David B. Smith*_____
                                    Counsel for Nordean


                                    */s/ J. Daniel Hull_____*
                                    *Counsel for Biggs*

43